**SO ORDERED: July 27, 2012.**



**Basil H. Lorch III**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| EASTERN LIVESTOCK CO., LLC, | ) | Case No. 10-93904-BHL-11 |
| Debtor | ) | |
| _____ | ) | |
| | ) | |
| FRIONA INDUSTRIES, LP, et al, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 11-AP-59093 |
| | ) | |
| EASTERN LIVESTOCK CO., LLC, et al, | ) | |
| Defendant. | ) | |
| _____ | ) | |

**ORDER**

This matter involves a dispute between Cactus Growers, Inc. ["Cactus"] and Robert Nichols, Jane Nichols, Nichols Livestock and Jane, LLC [collectively referred to as "Nichols"] regarding payment for certain livestock delivered on November 8, 2010.  Nichols alleges that Nichols Livestock purchased 125 steers from SOLM, Inc., Invoice # CN 468, and resold the Lot directly to Cactus for $110,230.17.  Cactus, on the other hand, asserts that it was under Contract with Eastern

Livestock Co., LLC ["Eastern"] for delivery of the subject cattle and, having paid Eastern a down payment for such cattle, seeks to retain the benefit of its bargain. Cactus filed an interpleader action seeking a determination on that issue as set forth more fully hereinbelow. It is presently, however, before the Court on the **Motion for Summary Judgment Against Robert Nichols, Jane Nichols, Nichols Livestock and Jane, LLC.** (Doc. # 263) filed by Cactus on October 31, 2011, and the **Motion for Summary Judgment Against Cactus** (Doc. # 321) filed by Nichols on December 21, 2011.

<u>Background</u>

Sometime prior to the initiation of involuntary bankruptcy proceedings against it, Eastern was doing business as a livestock dealer, acquiring cattle from various sources and reselling that cattle for profit to end users and purchasers such as Cactus ["Buyers"]. In acquiring cattle, Eastern either purchased the cattle through livestock auctions or from individual suppliers such as Nichols Livestock. Prior to the bankruptcy filing, Eastern had entered into several agreements for the sale of cattle to Buyers. The terms of those transactions, defined by written contracts between the parties, generally included the following:

- A description of the cattle being sold;

- Delivery at a future set date to the buyers' feed yards;

- Subject to certain contingencies, the buyer was responsible for a "down payment" on the cattle equivalent to $30 per head with final payment due following delivery.

There were two general types of contracts that Eastern entered into. There were short-term Orders to be filled within 30 days and which required no down payment and long-term Orders which provided for future delivery of cattle to Buyers which did require a down payment. In early

2

November 2010, Eastern's checks began to bounce and Buyers became aware of active rumors that Eastern was in financial difficulty.  On or about November 4, 2010, the Buyers were informed by Eastern's President, Tommy Gibson, that Fifth Third Bank had frozen all of Eastern's bank accounts. Beginning on that date and subsequent thereto, the Buyers were contacted by numerous parties who claimed to have sold cattle to Eastern and not been paid ["Unpaid Claimants"].  When those Unpaid Claimants began seeking payment from the Buyers directly for cattle that was delivered to a Buyer-owned feedyard facility, the Buyers interpleaded the contested monies for a resolution of competing interests.[1]

The instant controversy between Cactus and Nichols involves 125 steers that were delivered to Cactus on November 8, 2010, and for which Nichols was not paid.[2]  Unlike some transactions involving Unpaid Claimants, however, Robert Nichols asserted that Nichols Livestock was not under contract with Eastern for the purchase of the subject cattle which was delivered to Cactus.  Instead, he contends that the cattle were delivered to Cactus independently of Eastern and with the expressed expectation of payment from Cactus. If, in fact, Eastern was not a party to the transaction, Nichols contends that he is entitled to the interpleaded funds as a matter of law.

---

[1]In response to this Court's **Order** dated May 3, 2012 (Doc. # 435), Cactus interpleaded additional funds in the amount of $37,066.33 to satisfy the jurisdictional requirements of a statutory interpleader action and filed an **Amended Complaint** (Doc. # 444).

[2]The 125 steers at issue here are the same 125 steers at issue in AP 11-59087 *Cactus Growers, Inc. v. Nichols* also pending before this Court. By **Order** entered in AP 11-59087 on May 18, 2011 (Docket # 20), "all claims between Cactus Growers, Inc. and Cactus Feeders, Inc., on the one hand, and Robert Nichols, Jane Nichols, Nichols Livestock, and Jane, LLC, on the other hand, regarding the 125 steers in issue will be litigated only in this Court, in adversary proceeding No. 11-59093."

3

## Procedural Background and Jurisdiction

The underlying adversary proceeding was originally commenced on November 11, 2010, by Friona Industries, L. P. ["Friona"] against Eastern as a statutory interpleader action in the Northern District Court of Texas, Amarillo Division ["Interpleader Action"].  Thereafter, Cactus intervened in the Interpleader Action filing a separate Complaint in the Nature of an Interpleader.  After an involuntary bankruptcy proceeding was commenced against Eastern on December 6, 2010, the Interpleader Plaintiffs sought removal of the Interpleader Action to the bankruptcy court in Amarillo alleging that it was "related to" the Indiana bankruptcy because it concerned the right to the interpleaded funds, of which Eastern was a claimant, and that the result may (1) alter the rights, obligations, and choices of action of the debtor, and (2) have an effect on the administration of the estate.  The Interpleader Plaintiffs further sought to transfer the venue from the Amarillo bankruptcy court to this Court noting interests of judicial economy and further noting, under 28 U.S.C. § 1404(a) and 28 U.S.C. § 1409(a), that the Interpleader Action could have originally been brought in the New Albany Division of the Southern District of Indiana inasmuch as Eastern's principal place of business is located in this judicial district.

The District Court thus removed the action to the Amarillo Bankruptcy Court, which transferred the proceeding to this Court.  The matter, having been removed and referred to this Court, constitutes an adversary proceeding that is a core proceeding under 28 U.S.C. § 157(K) and/or (O).  Accordingly, this bankruptcy court has jurisdiction over this adversary proceeding.

## Standard of Review

Summary judgment is mandated where there are no disputed issues of material fact and the movant must prevail as a matter of law. *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d

4

832, 836 (7th Cir. 1994). The moving party bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party presents a prima facie showing that he is entitled to judgment as a matter of law, the party opposing the motion may not rest upon the mere allegations or denials in its pleadings but must affirmatively show that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex*, 477 U.S. at 323; *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When reviewing facts in support of a motion for summary judgment, a court must construe all facts in the light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid-American, Inc.*, 45 F.3d 231, 234 (7th Cir. 1995). The court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but rather to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249.

<u>Undisputed Facts</u>

On August 6, 2010, Cactus entered into a Contract for Sale of Cattle with Eastern Livestock, Contract # 39918, whereby Eastern agreed to sell Cactus 2000 steers to be delivered to "various Cactus feedyards" between the dates of November 1 and November 30, 2010 (Doc. # 265, Exhibit K). The contract provided specific weight, age, sex, price, slide term, and weight limit for the subject cattle. It also specified origin of cattle, breed and color, weighing conditions, F.O.B. delivery at "various locations" and a pricing term.

5

Early in the morning on November 8, 2010, Eastern faxed Cactus a sheet entitled "Cactus Deliveries" listing various shipments Cactus could expect to receive that day, including a shipment in two loads of 125 steers from Waurika, OK referencing contract # 39918 (Doc. # 265, Exhibit I). That same evening, Eastern faxed to Cactus a Nichols Livestock invoice, Invoice No. 2018 which lists Cactus Feeders, Inc. as buyer of 125 steers shipped to Cactus's Stratford Feedyard (Doc. # 265, Exhibit H). The Nichols Invoice appears to reference "Cactus CF# 39918" and is payable to Robert and Jane Nichols. It contains a term, "Cactus pays trucks" and sets forth the trucker's information and mileage and a price of $2370.00. The invoice appears to list the cattle against a 750 lbs contract and then references Cactus CF # 39918 against a 775 lbs contract. An amount due of $110,230.17 is only listed under the first set of numbers.

Robert Nichols bought and sold cattle, over the years, both on behalf of Eastern and on his own account for Nichols Livestock. Nichols, in support of his claim, has produced evidence that he purchased the subject cattle on November 8, 2010, which invoice indicates that Robert Nichols purchased 125 steers weighing an average of 785 pounds from SOLM, Inc, Invoice # CN 468 for $109,205.40, including a deposit of $3,690.00. Nichols paid SOLM $105,515.40 for Invoice # CN 468 with Check # 7263 dated November 12, 2010 (Doc. # 321, Exhibit K).

<u>Analysis</u>

As regards the instant controversy, the evidence establishes that Nichols bought the 125 steers that were delivered to Cactus on November 8, 2010. He purchased them from SOLM and paid for them himself. While the 125 steers may have originally been subject to an existing contract

6

between Nichols Livestock and Eastern,[3] the Court finds that Eastern's inability to make payment under the contract constituted a breach or anticipatory repudiation of the contract which prompted Nichols to seek another buyer for his cattle.[4] *See e.g., Deep Nine, Inc. v. McAfee, Inc.*, 246 S.W.3d 842, 848 (Tx.App. 2008) (payment by check that is subsequently dishonored constitutes a material breach excusing non-breaching party from further performance under the terms of the agreement).

Gibson, perhaps in an effort to mitigate losses, advised Nichols that Cactus would take delivery of the 125 steer. Clearly, Gibson was in a unique position to know that Cactus had unfulfilled cattle needs inasmuch as it was Eastern itself that had contracted to provide them. Gibson and employees of Eastern then helped facilitate the transaction[5] at Nichols' request. Nevertheless, the Court finds that the cattle were not delivered to Eastern and Eastern never acquired a property interest in the 125 steers.

Cactus argues that it was not privy to any arrangement between Eastern and Nichols and that

---

[3] Nichols Livestock contracted to provide about 300 steers to Eastern sometime prior to November, 2010. When Nichols delivered the first load of approximately 126 steer, however, Eastern's check bounced and was returned unpaid to Nichols on November 3, 2010. At that time, according to Robert Nichols' deposition testimony, Tommy Gibson acknowledged that he could not perform under the terms of his contracts. Nichols testified that he thereafter deemed any outstanding contracts as cancelled based upon Eastern's inability to pay.

[4] Ordinarily, a court must apply the choice-of-law rules of the state in which it sits; however, where a case is transferred under change of venue statute, it must apply the choice-of-law rules of the state from which the case was transferred. *Hill-Jackson v. FAF, Inc.*, 808 F.Supp.2d 1083, 1088 (S.D.Ind. 2011). The Texas choice-of-law provision, as set out in V.T.C.A. Bus. & C. §1.301, indicates that Texas law would apply.

[5] It is undisputed that Eastern completed the blank Nichols Livestock Invoice and faxed it to Cactus. Cactus points out that "[t]his was the first time in 20+ years that Nichols ever sent a blank Nichols Livestock invoice to Eastern for completion." The Court would suggest that such an irregularity tends to support Nichols' allegation that this transaction was not the usual course of dealing between the parties.

7

it had no independent agreement with Nichols. While it may be true that there was no "meeting of the minds" between Nichols and Cactus, that only establishes that there was no enforceable contract between them. It doesn't change the underlying facts that the 125 steers were paid for by Nichols, that Eastern did not have a property interest in the cattle, and that on November 8, 2010, Nichols delivered those cattle to Cactus, reasonably believing that he was dealing directly with Cactus and with a reasonable expectation of payment from Cactus. Because Cactus ultimately accepted the cattle which Nichols delivered, under such circumstances as reasonably notified Cactus that Nichols expected to be paid by Cactus for the cattle, the Court concludes that Nichols is entitled to payment under the theory of quantum meruit. *See Heldenfels Bros., Inc. v. City of Corpus Christi,* 832 S.W.2d 39 (Tex.1992).

Quantum meruit is an equitable remedy which does not arise out of a contract, but is independent of it. *Colbert v. Dallas Joint Stock Land Bank,* 129 Tex. 235, 102 S.W.2d 1031, 1034 (1937). Generally, a party may recover under quantum meruit only when there is no express contract covering the services or materials furnished. *Truly v. Austin,* 744 S.W.2d 934, 936 (Tex.1988). This remedy "is based upon the promise implied by law to pay for beneficial services rendered and knowingly accepted." *Id. See Campbell v. Northwestern National Life Insurance Co.,* 573 S.W.2d 496, 498 (Tex.1978).

To recover under the doctrine of quantum meruit, a plaintiff must establish that: (1) valuable services and/or materials were furnished, (2) to the party sought to be charged, (3) which were accepted by the party sought to be charged, and (4) under such circumstances as reasonably notified the recipient that the plaintiff, in performing, expected to be paid by the recipient." *Heldenfels Bros.*, 832 S.W.2d at 41. The measure of damages for a claim in quantum meruit is the reasonable value

8

of the work performed and the materials furnished. *M.J. Sheridan & Son Co. v. Seminole Pipeline Co.,* 731 S.W.2d 620, 625 (Tex.App.-Houston [1st Dist.] 1987, no writ).   In this case, it is undisputed that the cattle were delivered to, and accepted by, Cactus. The only element to be determined is whether Nichols has established that the cattle were delivered and accepted under such circumstances as reasonably notified Cactus that Nichols expected payment for the cattle.

Although the Court is satisfied that Nichols made a reasonable effort to notify Cactus that it expected direct payment for the cattle, there is ample evidence to substantiate Cactus' alleged "confusion" regarding the physical transfer of these cattle and the terms of payment.   Yet the Court need not determine whether the terms were clear.   The Court need only find that the cattle were delivered and accepted under such circumstances as reasonably notified Cactus that Nichols expected to be paid by Cactus for the cattle and the Court finds that they were.   Despite the confusion, therefore, Cactus was reasonably notified that Nichols expected payment for the cattle which was delivered on November 8, 2010.

If there was any doubt that the initial invoice requested that payment be tendered to Nichols, that expectation was made clear in the days immediately following the delivery, between November 9 and November 15, when Nichols communicated directly with Cactus employees regarding payment.   In *RC Management, Inc. v. Texas Waste Systems, Inc.*, 2003 WL 1712535 (Tex.App.-San Antonio), the court concluded that RCM was on notice that TWS expected to be paid when, despite the various demands for payment, RCM continued to accept TWS's garbage services without objection. In this case, because Cactus retained the cattle despite Nichols' demand for payment or return of the cattle, the Court finds that all the elements for quantum meruit have been established.

Cactus counters that it stands ready, willing and able to pay for the cattle but it seeks to retain

9

the benefit of the bargain it struck with Eastern.  Unfortunately, however, after November 4, 2010, Eastern was not in a position to perform under the terms of its prior Contract with Cactus.  As a result, Cactus holds a pre-petition claim against Eastern for the amount of that down payment, and there is no basis for shifting that loss to Nichols.

<u>Damages under Quantum Meruit</u>

The measure of damages on a quantum meruit claim is the reasonable value of services or material provided.  *Lamajak, Inc. v. Frazin*, 230 S.W.3d 786, 796 (Tex.App-Dallas 2007).  In this case, therefore, Nichols' claim would be for the reasonable value of the 125 steer provided on the date of delivery.  Because there was no contract between the parties regarding the shipping, the Court is not inclined to award those costs.  Further, because the Court has not heard evidence on valuation, it is unclear what the value of the cattle would have been on November 8, 2010.  The Court will, therefore, conduct an evidentiary hearing to ascertain the value of the cattle at a date and time to be set  by the Court.

Nichols' Motion for Summary Judgment against Cactus is, accordingly, **GRANTED** in accordance herewith and Cactus' Motion for Summary Judgment is **DENIED**.

**IT IS SO ORDERED AND ADJUDGED.**

### ###